# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED

DEC 1 2001

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| NESTLE HOLDINGS, INC. and NESTLE TRANSPORTATION COMPANY, | ) ) ) | Case No. 01 C 5081 |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Judge Elaine E. Bucklo |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, | ) ) ) | |
| Defendant. | ) | |

DOCKETED

DEC 12 2001

## BRIEF IN SUPPORT OF COMPLAINT
## TO MODIFY AND VACATE IN PART ARBITRATION AWARD

Mark A. Casciari
John M. Vande Walle
Seyfarth Shaw
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000

December 10, 2001



# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF CASES............................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTS ................................................................................................................................. 3

ISSUES ................................................................................................................................ 7

ARGUMENT....................................................................................................................... 7

I.     THE DISTRICT COURT'S STANDARD OF REVIEW IN THIS CASE IS TO
MAKE A DE NOVO REVIEW OF THE ARBITRATOR'S CONCLUSIONS OF
LAW.................................................................................................................... 7

II.    NESTLE PARTIALLY WITHDREW FROM THE FUND ONLY IF IT
TRANSFERRED THE WORK IN THE JURISDICTION OF THE CBAs TO
ANOTHER LOCATION ..................................................................................... 9

    A.    Transferring "To Another Location" Means To Nestle Employee Drivers
And Not To Any Other Part Of The Nestle Transportation Network .............. 10

    B.    There Is No Transfer Of "Such Work" Where The Work In The
Jurisdictions Of The Contracts Could Not Be Identified After The
Closures And Nestle Did Not Convey Work From One Group Of
Employees To Another.................................................................................. 11

    C.    Arbitrator Eisler Based His Finding Of A Transfer On An Impermissible
Presumption Unsupported By Law And This Presumption, Even If True,
Did Not Demonstrate A Transfer Of Work ..................................................... 13

III.    ARBITRATOR EISLER SHOULD HAVE GRANTED NESTLE'S MOTION
TO STRIKE THE FUND'S VOLUMINOUS AND IRRELEVANT EXHIBITS ...... 20

CONCLUSION .................................................................................................................. 22

# TABLE OF CASES

CASES

Central States v. Hunt Truck Lines, Inc., 204 F.3d 736 (7th Cir. 2000) ......................... 7-8

Central States v. Nitehawk Express, Inc., 223 F.3d 483 (7th Cir. 2000)............................9

Chicago Truck Drivers Union Pension Fund v. Louis Zahn Drug Co.,
890 F.2d 1405 (7th Cir. 1989)................................................................................9

OTHER AUTHORITIES

PBGC Op. Letter 86-17 (Aug. 13, 1986).................................................... 10-11

PBGC Op. Letter 83-20 (Sept. 2, 1983) ...........................................................19

PBGC Op. Letter 82-13 (Apr. 12, 1982) ..........................................................10

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NESTLE HOLDINGS, INC. and NESTLE TRANSPORTATION COMPANY, | ) ) ) | Case No. 01 C 5081 |
| Plaintiffs, | ) ) ) | Judge Elaine E. Bucklo |
| v. | ) ) | |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, | ) ) ) | |
| Defendant. | ) ) | |

## BRIEF IN SUPPORT OF COMPLAINT
## TO MODIFY AND VACATE IN PART ARBITRATION AWARD

Plaintiffs Nestle Holdings, Inc. and Nestle Transportation Company (hereinafter "Nestle") submit the following brief in support of their complaint and motion to modify and vacate in part the arbitration award of arbitrator William O. Eisler rendered on June 1, 2001 in the arbitration between Nestle and Central States, Southeast And Southwest Areas Pension Fund (hereinafter the "Fund"), American Arbitration Association Case Number 51 621 00359-97.

## INTRODUCTION

This is a case of first impression for the federal courts. It concerns the meaning of the word "transfer" in Section 4205(b)(2)(A)(i) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1385(b)(2)(A)(i). Nestle requests that the Court modify and

vacate in part the decision and award of arbitrator Eisler because, as a matter of law, he misinterpreted the statutory term "transfer."

This action stems from Nestle's decision to close two trucking terminals in 1995. The terms of employment of the drivers domiciled at these terminals were covered by collective bargaining agreements (hereinafter "CBAs"). These CBAs required contributions be made to the Fund. ERISA Section 4205(b)(2)(A)(i) imposed a partial "withdrawal liability" of more than $1.2 million on Nestle when it closed its two terminals *only if* Nestle "transferred" the work covered by the CBAs to other Nestle employee drivers for whom Nestle did not make pension contributions to the Fund. Mr. Eisler correctly found the basic facts surrounding the closure of the terminals. He improperly held, however, that Nestle transferred the work because (i) the CBA work could not be identified as moving from the Fund participants to Nestle employees not participating in the Fund and (ii) the amount of work performed by the Nestle drivers for whom Nestle owed no contributions to the Fund did not increase following the terminal closures. There simply and plainly was no transfer. The arbitrator was wrong as a matter of law to conclude otherwise and to uphold the Fund's imposition of a partial withdrawal liability on Nestle.

# FACTS

Nestle's primary business is food production. (Arb. Decision at 2 (attached at Tab 1 hereto).)[1] As part of that business, it ships its products throughout the country and world. It ships its product within the United States substantially through a network of trucks and drivers consisting of employee drivers, owner/operator (independent contractor) drivers, and third party common carriers who are trucking companies independent of Nestle. (Id.) This system, employing all of these methods of shipment, is known as the "Network". (Id.) Until 1995, Nestle operated, among other terminals, trucking terminals in St. Joseph, Missouri, and Oconomowoc, Wisconsin. (Id. at 2-4.) It employed drivers at these terminals. (Id. at 2.) The drivers were covered by CBAs between Nestle and two Teamsters local unions, Local No. 460 at St. Joseph and Local No. 695 at Oconomowoc. (Id. at 2-3.) The CBAs required that Nestle make contributions on the drivers' behalf to the Fund, a multiemployer pension benefit plan regulated by ERISA. (Id. at 3.)

Nestle employed eight Local 460 drivers at St. Joseph and three Local 695 drivers at Oconomowoc. (Id. at 2.) The CBAs in effect at both terminals defined the jurisdiction of the union work as that performed by the drivers domiciled at each terminal. (Id. at 2-3) Neither CBA guaranteed any particular number of trucking runs or any particular trucking "lanes" (routes over which the drivers transported Nestle products) to either the Local 460 drivers or

---

[1]  The arbitrator's decision is cited herein as Arb. Decision at __, and is attached at Tab 1. The arbitration hearing transcript is cited as Arb. Tr. __. References to the Fund's initial (corrected) arbitration brief are cited as Fund Arb. Br. at __. References to the Fund's response to Nestle's motion to strike exhibits is cited as Fund Arb. Resp. Mot. Strike at __. The exhibits within the administrative record are cited as Arb. Ex. __. Where copies of arbitration exhibits are attached to this document, it is so noted in the citation.

the Local 695 drivers. (Id. at 3.) In practice, three of the Local 460/St. Joseph drivers and

one Local 695/Oconomowoc driver drove local lanes that were not driven by any other

drivers in the Network. (Id.) The remaining five Local 460 and two Local 695 drivers were

assigned to a variety of over-the-road, long distance lanes. (Id.) The Local 460 and Local

695 drivers shared the long distance lanes with other parts of the Network, including non-

Fund employee drivers, owner/operator drivers, and common carrier drivers. (Id.) The

Local 460 and Local 695 truck drivers did not drive any particular long distance lane to the

exclusion of the other drivers. (Id.)

In 1995, Nestle assigned long distance lanes to the Local 460 and Local 695 drivers by using

criteria that applied equally to the other members of the Network. (Id.) Assignments were

based on considerations of efficiency and convenience including the availability of the

driver, the driver's location when an assignment needs to be made, and the number of

additional hours a particular driver could drive without exceeding the limits set in United

States Department of Transportation regulations. (Id.)[2]

In 1995, Nestle reached agreements with Locals 460 and 695 to shut down the St.

Joseph and Oconomowoc terminals. (Id. at 3-4.) After closing the terminals, Nestle ceased

its local lane trucking. (Id. at 4.) It continued to assign long distance trucking lanes to the

---

[2]     Mr. Eisler's characterization of the assignments as being made on a "randomly
selected basis" (id.), is inexact. The assignments were not random in the sense that Nestle
assigned lanes based only on chance and without regard to business needs. Rather, Nestle
made assignments based on the factors enumerated by Mr. Eisler in his decision. (Id.) Mr.
Eisler appears to use the word "random" to mean that the assignments were not determined
in advance of need, the same drivers were not assigned to the same lanes each time, and there
was substantial variation in driver assignments, all of which is true.

various parts of the Network as it had before. (Id.)[3] After the closures, Nestle used the same criteria of driver availability, driver location, and number of hours driven to determine lane assignments. (Id.) After the closures, the long distance lanes that Local 460 and Local 695 drivers had driven non-exclusively while employed by Nestle were driven by the remaining parts of the Network: non-Fund employee drivers, owner/operator drivers, and third party common carriers. (Id.) Each of these groups of drivers had driven in these lanes when the St. Joseph and Oconomowoc terminals were operating. (Id.) After the closures, Nestle handled *fewer* trucking runs in the long distance lanes to which Nestle had assigned Local 460 and Local 695 employee drivers prior to the closures. (Arb. Exs. 25-26, 76, 78, 80, 82, 84, 86, 88 (containing charts showing the decline in the number of runs into and out of St. Joseph and Oconomowoc following the closures) (copies attached at Tab 2).)[4] The number of non–Local 460 and Local 695 employee drivers assigned to these lanes after the closures *decreased* as compared to the number of non-Fund employee drivers assigned to these lanes before the closures. (Arb. Exs. 25-26, 76, 78, 80, 82, 84, 86, 88 (showing also the decline in the number of runs into and out of St. Joseph and Oconomowoc handled by non-Local 460 and Local 695 employee drivers after the closures) (copies attached at Tab 2).)

---

[3]  The local lanes were driven by third party drivers after the closures. (Id.) Nestle and the Fund agree that, because no local lane was driven by a Nestle employee driver after the closures, there was no "transfer" of the local lane work within the meaning of ERISA Section 4205(b)(2)(A)(i).

[4]  These exhibits and the data supporting them are discussed and explained, without contradiction, in the arbitration hearing testimony of Nestle employee James J. Rizzo. (Arb. Tr. 344-422.)

Nestle ceased making contributions to the Fund on behalf of the Local 460 and Local 695 employee drivers once it closed the terminals at which those drivers were domiciled.[5] The Fund then imposed partial withdrawal liability on Nestle of $1,257,598.41. (Arb. Decision at 9; Arb. Exs. 5, 7.) Nestle then paid and appealed the assessment to an arbitrator as required by ERISA Section 4221(a), 29 U.S.C. § 1401(a).

Arbitrator Eisler upheld the Fund's partial withdrawal liability assessment. (Arb. Decision at 17.) He stated: "[S]ince the evidence is undisputed that the assignment of drivers was made with the same randomness [sic] after the terminal closures as were the assignments before the closures, it logically follows that some of the work formerly performed by the Local 460 and 695 drivers had to be performed after the terminal closures by other Nestle non-Fund-covered employee drivers." (Id. at 14.) In other words, Mr. Eisler *presumed* that, after the closures, some quantity of long distance lane assignments that would have gone to the Local 460 and Local 695 drivers prior to the closures transferred to other Nestle employee drivers for whom Nestle owed no contributions to the Fund. Mr. Eisler so held even though the Nestle non-Fund employee drivers did not drive more lanes after the closures than they had before the closures.

Nestle now seeks to modify and vacate in part arbitrator Eisler's decision and award in favor of the Fund, as allowed by ERISA Section 4221(b)(2), 29 U.S.C. § 1401(b)(2).

---

[5]     Nestle and the Fund agree that, after the terminal closures, Nestle has continued to employ some employees at other locations on whose behalf it has been making pension contributions to the Fund in full compliance with ERISA.

## ISSUES

1. As a matter of law, did the arbitrator err in finding that Nestle transferred the work of Locals 460 and 695 to Nestle employee drivers who did not participate in the Fund?

2. As a matter of law, did the arbitrator err in denying Nestle's motion to strike arbitration exhibits 60-68, 70-75, and 101, (Arb. Decision at 4-6), because these exhibits have no probative value whatsoever, and serve only to increase the size of the record and create confusion for its reader?[6]

## ARGUMENT

## I. THE DISTRICT COURT'S STANDARD OF REVIEW IN THIS CASE IS TO MAKE A DE NOVO REVIEW OF THE ARBITRATOR'S CONCLUSIONS OF LAW.

Title IV of ERISA, 29 U.S.C. §§ 1301–1461, sets forth terms and conditions that apply to a multiemployer pension fund's assessment of withdrawal liability on employers who participate in the fund. Title IV also sets forth the procedure to resolve a withdrawal liability dispute between an employer and a fund over withdrawal assessments. Congress designed Title IV to protect multiemployer funds from the possibility that employer withdrawals may leave a fund unable to pay its pension obligations. See Central States v. Hunt Truck Lines, Inc., 204 F.3d 736, 739 (7th Cir. 2000). But Title IV allows multiemployer funds to assess an amount representing an employer's share of the plan's unfunded pension obligations *if and only if* the employer "completely" or "partially"

---

[6] The arbitrator found that Nestle did not continue to perform work in the jurisdictions of the Local 460 and Local 695 CBA after the terminal closures. (Arb. Decision at 17.) Nestle does not challenge that finding.

withdraws from the plan within the meaning given those terms by ERISA. See 29 U.S.C. §§ 1381-85.

An employer completely withdraws from a multiemployer plan when it ceases to have any obligation to make any contributions to the fund. 29 U.S.C. § 1383. In such a case, the fund computes the employer's complete withdrawal liability representing the employer's entire share of the plan's unfunded pension obligations and collects that amount from the employer. 29 U.S.C. §§ 1381-1383. This is not a complete withdrawal case.

In certain limited circumstances set forth in ERISA Section 4205, an employer whose obligation to contribute to a multiemployer fund does not entirely cease is considered to have partially withdrawn from the plan and may be assessed a partial withdrawal liability. 29 U.S.C. § 1385. One of the circumstances in which an employer is said to have partially withdrawn from a plan is set forth in ERISA Section 4205(b)(2)(A)(i): "[T]he employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location . . . ." 29 U.S.C. § 1385(b)(2)(A)(i). This is the ERISA provision at issue between Nestle and the Fund.

When a multiemployer fund determines that an employer has partially withdrawn, it demands payment of the liability. 29 U.S.C. § 1382. An employer may then challenge the partial withdrawal liability assessment though arbitration and judicial review, but must make interim liability payments. 29 U.S.C. § 1401(a)(1), (b)(2); Hunt Truck, 204 F.3d at 739.

The district court reviews ERISA arbitrations with less deference than that afforded either to labor arbitrations under private collective bargaining agreements or to voluntary commercial arbitrations. Central States v. Nitehawk Express, Inc., 223 F.3d 483, 488 n.2 (7th Cir. 2000). In reviewing a withdrawal liability arbitration decision, the district court applies different standards of review depending on the issue involved. In reviewing issues of fact, the court applies a presumption, rebuttable only by a clear preponderance of the evidence, that the facts as decided by the arbitrator are correct. 29 U.S.C. § 1401(c); Nitehawk Express, 223 F.3d at 488. Importantly, however, the district court, applies a *de novo* standard of review to issues of law determined by the arbitrator. Chicago Truck Drivers Union Pension Fund v. Louis Zahn Drug Co., 890 F.2d 1405, 1410 (7th Cir. 1989). The issue presented in this action is an issue of law – the meaning of "transfer" in ERISA Section 4205(b)(2)(A)(i). The Court therefore should review Mr. Eisler's decision *de novo*.

## II. NESTLE PARTIALLY WITHDREW FROM THE FUND ONLY IF IT TRANSFERRED THE WORK IN THE JURISDICTIONS OF THE CBAs TO ANOTHER LOCATION.

There is no question that Nestle did not "continue" to perform work in the jurisdictions of the Local 460 and Local 695 CBAs because Nestle closed those terminals. Each contract defined its jurisdiction as the St. Joseph or Oconomowoc domicile, and not as the particular routes to which the Local 460 and Local 695 drivers were non-exclusively assigned. (Arb. Decision at 2-3.) Because there were no Nestle employee drivers domiciled at St. Joseph or Oconomowoc after the closures, Nestle did not "continue" to perform work in the contracts' jurisdictions within the meaning of ERISA Section 4205(b)(2)(A)(i).

Since Nestle did not continue performing work within the jurisdictions of the CBAs, it partially withdrew from the Fund only if it "transfer[red] such work to another location."

29 U.S.C. § 1385(b)(2)(A)(i). Considering the meaning of these words – both their plain meanings and their meanings in the context of ERISA – the arbitrator erred as a matter of law in finding that Nestle partially withdrew from the Fund.

### A. Transferring "To Another Location" Means To Nestle Employee Drivers And Not To Any Other Part Of The Nestle Transportation Network.

The "employer" must transfer work as a precondition to a partial withdrawal. 29 U.S.C. § 1385(b)(2)(A)(i). ERISA defines the "employer" as the controlled group of businesses of a contributing employer. 29 U.S.C. § 1301(b)(1). A controlled group is the grouping of trades or businesses under common (generally 80%) control. See 29 C.F.R. §§ 4203.2, 4001.2, 4001.3; Internal Revenue Code Sec. 414(c), 26 U.S.C. § 414(c). The Pension Benefit Guaranty Corporation (PBGC), the federal corporation charged with insuring ERISA benefit plans, has stated:

> We conclude that the term "employer" as defined in ERISA Section 4001(b) applies for all purposes under Title IV of ERISA, including a determination by a plan sponsor of whether a complete or partial withdrawal has occurred.
>
> The term "employer" for purposes of ERISA Title IV, including those sections added by the Multiemployer Act, is defined in section 4001(b):
>
> > For purposes of this title, under regulations prescribed by the corporation [the PBGC], all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades and businesses as a single employer.

PBGC Op. Letter 82-13 (Apr. 12, 1982) (attached at Tab 3).

"Another location" as used in Section 4205(b)(2)(A)(i) means other controlled group employees. The PBGC has taken this position: "An employer that permanently ceases covered work under one of its CBAs and instead contracts to buy the service or product from an independent third party therefore does not 'transfer such work to another location' within

the meaning of section 4205(b)(2)(A)(i) of ERISA." PBGC Op. Letter 86-17 (Aug. 13, 1986) (attached at Tab 4).

Thus, the focus of the partial withdrawal liability analysis in this case is work performed by non-Fund Nestle employee drivers after closure of the Oconomowoc and St. Joseph terminals. The issue is whether Nestle transferred the work of the Local 460 and Local 695 drivers to its non-Fund employee drivers. The Fund does not challenge this point.

**B.      There Is No Transfer Of "Such Work" Where The Work In The Jurisdictions Of The Contracts Could Not Be Identified After The Closures And Nestle Did Not Convey Work From One Group Of Employees To Another.**

The next step in determining whether Nestle partially withdrew from the Fund is to determine what it means to "transfer[] such work." 29 U.S.C. § 1385(b)(2)(A)(i). There is no case law or other authority interpreting this provision of ERISA, as Arbitrator Eisler recognized. (Arb. Decision at 12.) The plain meaning of these words, however, is all that is needed to determine what constitutes "transfer[ring] such work."

The phrase "such work" in the context of the statutory provision refers to the antecedent phrase "work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required." 29 U.S.C. § 1385(b)(2)(A)(i). The verb *transfers* is used in its plain sense. *Transfer*, as used here, is a transitive verb, meaning that it not only assumes a subject or actor as do all verbs, but it requires an object to give it meaning

– someone transfers something.[7] Further, the meaning of *transfer* is "to convey [something] from one person, place, or situation to another." <u>Webster's Ninth New Collegiate Dictionary</u> 1253 (1990) (definition available at *www.m-w.com*). This means that there are five elements to a transfer: (1) an actor (2) conveys (3) an object from (4) one person or place to (5) a second person or place. Within the context of the ERISA statutory language, the conveyance aspect of "transfer" is key because Section 4205(b)(2)(A)(i) contrasts *transfer* with the verb *continue*: "but continues . . . *or* transfers . . . ." 29 U.S.C. § 1385(b)(2)(A)(i) (emphasis added). The statute uses *transfer* to mean something other than *continues such work in another location*, or it would have used the word *continues* a second time. That other meaning is the conveyance of work from one location to another. In the context of the statute then, "transfers such work to another location" means (1) the employer (2) conveys (3) work in the jurisdiction of the CBA of the type for which contributions were previously required, from (4) the bargaining unit employees to (5) other employees outside of the bargaining unit for whom no Fund contributions are required. If any of these five elements is absent, there is no transfer.

There was no transfer in this case for two principal reasons. First, the necessary object cannot be identified. Because the work in the jurisdictions of the CBAs was defined by the domicile of the drivers doing the work – as far as long distance lanes were concerned – once the St. Joseph and Oconomowoc terminals were closed, there was no way to identify

---

[7] Transfer has some intransitive senses in other contexts. For example, a student can transfer from one school to another and a passenger from one bus to another. In these senses, there is a subject/actor – the student, the passenger – but no object is acted upon. Rather the subject itself transfers from one place to another. <u>See</u> Webster's Ninth New Collegiate Dictionary 1253 (1990) (definition available at www.m-w.com).

any work in the jurisdictions of their CBAs. With no ability to identify an *object* conveyed, it is not possible to determine that Nestle transferred anything from the Fund employees to other employees for whom it owed no contributions to the Fund. Thus, there was no transfer.

Second, No arbitrator can say on these facts that any work – no matter how identified – was *conveyed* from the Local 460 and Local 695 employee drivers to non-Fund Nestle employee drivers. The only arguable conveyance involved the long distance lanes, since the Local 460 and Local 695 local lanes ceased upon the closures to be run by any Nestle employee driver. As to the long distance lanes, both *before and after* the terminal closures, Nestle assigned employee drivers for whom it owed no Fund contributions to the same lanes to which it assigned Local 460 and Local 695 drivers before the closures. The number of runs driven by non-Fund Nestle employee drivers in long distance lanes previously driven by Local 460 and Local 695 drivers did *not* increase after the closures. (Arb. Exs. 25-26, 76, 78, 80, 82, 84, 86, 88 (showing the decline in the number of runs into and out of St. Joseph and Oconomowoc handled by non-Local 460 and Local 695 employee drivers after the closures) (attached at Tab 2).) Thus, there was no movement of work from the Local 460 and Local 695 employee drivers to the non-Fund employee drivers, and there was no transfer.

### C. Arbitrator Eisler Based His Finding Of A Transfer On An Impermissible Presumption Unsupported By Law And This Presumption, Even If True, Did Not Demonstrate A Transfer Of Work.

The arbitrator misapplied the plain meaning of the phrase "transfers such work." He presumed that "since the evidence is undisputed that the assignment of drivers was made with the same randomness [sic] after the terminal closures as were the assignments before the closures, it logically follows that some of the work formerly performed by Local 460 and Local 695 drivers *had to be* performed after the terminal closures by other Nestle non-Fund-

covered employee drivers." (Arb. Decision at 14 (emphasis added).) He found this presumption sufficient to establish a transfer of work from the Local 460 and Local 695 drivers to remaining employee drivers for whom Nestle owed no contributions to the Fund. He was wrong as a matter of law.

First, the arbitrator drew no support from ERISA in making his presumption. He found no actual evidence that any particular lane assignment going to a non-Fund employee driver after the closures would have gone to a Local 460 or Local 695 employee driver absent the closures. Instead, he dispensed with the need to find evidence by presuming it into existence. ERISA does not allow such a presumption to be made. There is nothing in Section 4205 that allowed him to make a presumption in favor of finding a partial withdrawal. But even beyond the inappropriateness of his presumption, the fact he presumed certain facts into existence does not establish a transfer of work from one group to another.

The arbitrator's presumption demonstrates nothing more than that a non-Fund employee driver continued to do something that both Fund- and non-Fund employee drivers could have done prior to the closures. The arbitrator justified his presumption by pointing out that Nestle used the same factors to make long distance lane assignments both before and after the closures. This ignores the undisputed fact that the non-Fund employee driver could have driven the lane before the closures as well as after, because the Local 460 and Local 695 drivers had no exclusive right to or jurisdiction over any long distance lanes. In this way, the arbitrator's presumption does not demonstrate that Nestle took action to convey work in the jurisdiction of the Local 460 and Local 695 drivers to its non-Fund employee drivers. It merely demonstrates that the work *continued* at another location where it had already been ongoing prior to the closures. The statutory language at issue requires a

*transfer* or conveyance of jurisdictional work from one location to another. Continuation of work does not suffice. The evidence presented to the arbitrator showed that the number of runs in long distance lanes covered by non-Local 460 and Local 695 employee drivers *decreased* after the terminal closures. (Arb. Exs. 25-26, 76, 78, 80, 82, 84, 86, 88 (showing the decline in the number of runs into and out of St. Joseph and Oconomowoc by non–Local 460 and Local 695 employee drivers after the closures) (attached at Tab 2).) Thus, the work was not conveyed from one group to another, even if one presumes that an assignment driven by a non-Fund employee driver after the closures would have gone to a Fund driver absent the closures. There was no *transfer* as a matter of law.

That the arbitrator's presumption does not evidence a transfer can be illustrated with an example. Consider an employer that makes widgets. As that employer makes widgets, it distributes them to one of three processors depending on which will next have available processing capacity – (1) plants run by its unionized employees for whom it pays contributions to a multiemployer pension fund; (2) plants run by its employees for whom it makes no fund contributions; and (3) plants owned by third parties that process the widgets for it under contract. The employer decides to close one of its unionized plants. The work in the jurisdiction of the CBA in place at the closed plant was defined as the work of processing widgets at that plant. The employer does not continue work in the jurisdiction of the CBA after the closure because the plant no longer processes widgets. The employer continues, however, to send widgets to the other facilities based on which plant will next have available processing capacity – the same factor it considered prior to the closure.

One can easily imagine that, after the closure, the employer sends widgets to its non-fund plants that the employees at the closed plant would have processed if that plant were

still open. In this sense, the employees for whom the employer owes no fund contributions are performing work that could have been performed by the workers at the closed plant, and the closed plant's work continued at another location. This is not enough, however, to show that the employer *transferred* work *in the jurisdiction* of the closed plant's contract to the plants run by non-fund employees. Without evidence that the plants run by non-fund employees began to process more widgets after the closure than before, there is no evidence that the employer *conveyed* jurisdictional work from the closed plant to the plants operated by its non-fund employees. The non-fund employees are doing the same work they did prior to the closure and are doing no more of it. The employer did not transfer work.

This conclusion is not altered by further imagining that the closed plant normally had available processing capacity on Tuesdays and, as a consequence, the employer had regularly sent widgets to the plant on Tuesdays. Thus, after the plant closure, one could say with certainty that some number of widgets distributed by the employer on Tuesdays to the plants run by non-fund employees would have been processed at the closed plant if it were still open. This, too, does not amount to evidence that the employer *transferred* work *in the jurisdiction* of the closed plant's collective bargaining agreement to its non-fund plants. Although the employer regularly sent widgets to the closed plant on Tuesdays, the closed plant had no jurisdictional claim on Tuesday's widgets. The employer was free to send Tuesday's widgets to any of its processors before the closure. Indeed, factors other than availability, such as cost, could have affected the employer's choice of facility. Clearly, through, the employer did not convey work *in the jurisdiction* of the closed plant's CBA to the non-fund plants. It did no more than reroute some Tuesday widget shipments. This does not constitute a transfer of work in the jurisdiction of the closed plant's CBA because the

closed plant had no jurisdictional claim on the Tuesday shipments and they could have been processed by the non-fund plants even before the closure. Unless the non-fund-covered plants process more widgets in the aggregate after the closure, one cannot say that the employer transferred to them work in the jurisdiction of the closed plant (even if the non-fund plants receive more Tuesday widget shipments after the closure than they did previously).

In Nestle's case, it distributes long distance lane assignments in a manner like the employer in the example distributed widgets for processing. The Local 460 and Local 695 drivers had no claim to any particular lane assignments, just as the workers at the closed plant had no claim to the widgets shipped on any particular day. Once the St. Joseph and Oconomowoc terminals were closed, Nestle continued to divide the lane assignments among the remaining members of its transportation Network using the same factors it had before. After the closures, Nestle did not give more lane assignments to its employee drivers for whom it owed no Fund contributions than it did previously. (Arb. Exs. 25-26, 76, 78, 80, 82, 84, 86, 88 (showing the decline in the number of runs into and out of St. Joseph and Oconomowoc handled by non-Local 460 and Local 695 employee drivers after the closures) (attached at Tab 2).) Thus, Nestle did not transfer work from the Local 460 and Local 695 drivers to its non-Fund employee drivers.

Also as in the example, evidence that Nestle in practice tended to assign the Local 460 and Local 695 drivers to any particular lanes on a regular basis does not alter this conclusion. Because the Local 460 and Local 695 drivers had no jurisdictional claim on any particular long distance lanes, a showing that non-Fund employee drivers drove more of any particular lane after the terminal closures than before does not show that Nestle transferred

work *in the jurisdiction* of the Local 460 and Local 695 CBAs to its non-Fund employee drivers, absent proof that Nestle gave more lane assignments in the aggregate to its non-Fund drivers after the closures than before. The non-Fund drivers could have driven these lanes even absent the closures without infringing on the jurisdiction of the Local 460 and Local 695 CBAs.[8] The closure of the terminals did not change that undisputed fact.

Section 4205(b)(2)(A)(i) requires at a minimum evidence that Nestle assigned non-Fund employee drivers to more lanes after the closures than before to find that Nestle transferred jurisdictional work from Local 460 and Local 695 drivers to its non-Fund employee drivers. The arbitration record does not contain such evidence. Where the Local 460 and Local 695 drivers had no claim to any particular lane assignments, any shift in assignments to particular lanes from a Local 460 or Local 695 driver to a non-Fund employee driver that did not increase the amount of work performed by non-Fund drivers in

---

[8]     This conclusion is not altered by the Fund's identification of four individual lanes that saw minor increases in the number of runs handled by non-Fund employee drivers after the terminal closures. (Arb. Exs. 96A-99A.) As previously stated, the jurisdictions of the Local 460 and Local 695 CBAs were not defined by particular lanes. (Arb. Decision at 3.) Thus, the increases identified by the Fund are not evidence that work in the jurisdictions of the CBAs was transferred to other Nestle employee drivers. Only an increase in the aggregate number of long distance lane runs assigned to non-Fund employee drivers would be evidence of a transfer of such work.

    Further, the identified increases, which range from 0.5 to 7 runs per lane, do not correspond to the number of runs made by Local 460 and Local 695 drivers in each particular lane prior to the closures. (Arb. Exs. 96A-99A.) Indeed, only one Local 460 or Local 695 driver made each run during the pre-closure period used by the Fund for comparison purposes, (Arb. Exs. 96A-99A), demonstrating that these particular lanes have no significance to the transfer issue. The arbitrator did not mention this evidence in his decision. Moreover, he did not rely on the Fund argument as he resorted to a presumption to find that "some of the work formerly performed by the Local 460 and [Local] 695 drivers had to be performed after the terminal closures by other Nestle non-Fund-covered employee drivers." (Arb. Decision at 14 (emphasis added).)

the aggregate is no more that a *de minimis* effect of the closures on the work of remaining employee drivers and is not evidence that Nestle transferred work in the jurisdiction of the Local 460 and Local 695 CBAs from one group of employees to another.

The arbitrator improperly relied upon a PBGC opinion letter in holding that such a *de minimis* shift constituted a transfer of work in all circumstances because "[t]here is no quantitative test with regard to the statutory requirement of a transfer or continuation of work." (Arb. Decision at 14 (relying on PBGC Op. Letter 83-20 (Sept. 2, 1983) (attached at Tab 5).) The opinion letter cited by the arbitrator does not actually answer the question of what constitutes a transfer within the meaning of Section 4205(b)(2)(A)(i). Rather, the opinion letter illustrates the point that a mere closure of a plant is not enough to trigger partial withdrawal liability from a plan where the work performed at the closed location is shifted to other locations where the employer also contributes to the plan. PBGC Op. Letter 83-20. The letter states that if "any of the work is shifted to a location where contributions are not required to the plan, then a partial cessation of the employer's obligation will occur." Id. The letter's illustration, however, assumes that the work performed at the closed location was shifted to other facilities and assumes no difficulty in identifying the work previously performed at the closed location. The letter states that questions concerning "the jurisdiction of any specific collective bargaining agreement . . . are to be resolved through the statutory dispute resolution process." Id. Thus, the opinion letter does not support the arbitrator's view that a transfer of work occurred under Section 4205(b)(2)(A)(i) if one of Nestle's non-Fund drivers drove *any* lane after the closures that could have been driven absent the closures by a Local 460 or Local 695 driver. Under the terms of the CBAs as determined by the arbitrator, this fact is not evidence of any movement of work from one group to the other.

Nestle owes no partial withdrawal liability to the Fund as a matter of law because it did not transfer work in the jurisdiction of the Local 460 and Local 695 CBAs to its non-Fund employee drivers following the closures of the St. Joseph and Oconomowoc terminals.

## III. ARBITRATOR EISLER SHOULD HAVE GRANTED NESTLE'S MOTION TO STRIKE THE FUND'S VOLUMINOUS AND IRRELEVANT EXHIBITS.

The Fund introduced a number of exhibits – exhibits 63 through 68, 70 through 75, and 101 – that served merely to attempt to inflate the record to an unmanageable size without providing information relevant to the transfer issue. These exhibits contain no fact tending to make it more or less likely that Nestle employee drivers for whom Nestle owed no contributions to the Fund drove more long distance lanes after the terminal closures than before. These exhibits merely show that Nestle continued to assign other employee drivers to some of the lanes to which the Local 460 and Local 695 drivers had been assigned prior to the terminal closures or serve as evidence of Nestle's management goal in closing the terminals. Arbitrator Eisler should have granted Nestle's motion to strike these exhibits.

Exhibits 63 through 68 consist of voluminous computer spreadsheets providing shipment details for truck lanes originating or terminating in St. Joseph and Oconomowoc in years before and after the terminal closures. Exhibits 60 through 62 and 70 through 75 similarly summarize shipment information regarding truck lanes originating in St. Joseph and Oconomowoc. This information is irrelevant because, as arbitrator Eisler recognized (Arb. Decision at 2-3), these truck lanes were not in the jurisdiction of the Local 460 and Local 695 CBAs except when driven by Local 460 and Local 695 drivers. Thus, these exhibits do not help to answer whether Nestle transferred work in the jurisdiction of the CBAs to its employee drivers for whom it owed no Fund contributions after the terminal closures. They

merely provide historical information on particular truck lanes that, under the terms of the CBAs, Nestle was free to assign to non-Local 460 and Local 695 drivers. The Fund must show that Nestle assigned more truck lanes to its non-Fund employee drivers after the terminal closures, not merely that it assigned some number of these particular lanes to its non-Fund employee drivers after the terminal closures. These exhibits do not tend to make it more or less likely that Nestle assigned more long distance truck lanes to its non-Fund employee drivers after the closures.

Exhibit 101 is the entire deposition transcript of Rob Iverson, Nestle senior vice president of transportation and distribution. (Arb. Ex. 101, at 9.) This exhibit is irrelevant, and arbitrator Eisler should have stricken it from the record. The only reason the Fund cited this deposition was to refer to statements regarding Nestle's general management goal in closing facilities such as the terminals in St. Joseph and Oconomowoc. (Fund. Arb. Br. 29 (citing Ex. 101 at 22, 38, 44, 59; Fund Arb. Resp. Mot. Strike at 12 (citing Ex. 101 at 59).) Mr. Iverson's statements concerned only Nestle's intention to consolidate management and supervisory functions after closing trucking terminals. (Ex. 101 at 22, 38, 44, 59.) In opposing Nestle's motion to strike exhibit 101, the Fund offered only a single quote from the deposition consisting of counsel for the Fund (and not Iverson) reading aloud from a news article quoting businessman Ross Perot, Jr. stating: "shut down those small facilities in out-of-the-way areas and bring them back into core markets." (Fund Arb. Resp. Mot. Strike at 12 (neglecting to state the quoted words were not those of Iverson).) The deposition offers no evidence that would allow a trier of fact to determine whether Nestle employee drivers for whom Nestle owed no contributions to the Fund drove more long distance lanes after the terminal closures than before. Furthermore, the article read by counsel at the deposition and

quoted in the Fund's opposition to Nestle's motion to strike is already in the record as Exhibit 39. Extraneous, irrelevant exhibits should not be included in the record because they only serve to distract the decision-maker from the issue at hand.

## CONCLUSION

The Court should (i) vacate the arbitrator's decision that Nestle transferred the work in the jurisdiction of the CBAs to other Nestle employee drivers within the meaning of ERISA Section 4205(b)(2)(A)(i), and (ii) strike Exhibits 60 through 68, 70 through 75, and 101, and (iii) modify the arbitrator's decision to provide that Nestle did not transfer work within the meaning of Section 4205(b)(2)(A)(i).

Respectfully submitted,

NESTLE HOLDINGS, INC. and NESTLE TRANSPORTATION COMPANY

_Mark A Casciari_
One of their attorneys

Mark A. Casciari
John M. Vande Walle
Seyfarth Shaw
55 East Monroe Street
Suite 4200
Chicago, Illinois 60603
(312) 346-8000

December 10, 2001

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he caused a true and correct copy of the

foregoing Plaintiffs' BRIEF IN SUPPORT OF COMPLAINT TO MODIFY AND VACATE

IN PART ARBITRATION AWARD to be served upon the following counsel of record, by

United States Mail, on this 10th day of December, 2001:

Brad R. Berliner
Central States, Southeast and Southwest Areas Pension Fund
P.O. Box 5123
Des Plaines, Illinois 60017-5123

_____
John M. Vande Walle

## LIST OF ATTACHMENTS

1. Decision and Award of W. Eisler, Arbitrator, American Arbitration Association Case No. 51 621 00359-97, June 1, 2001.

2. Arbitration Exhibits 25-26, 76, 78, 80, 82, 84, 86, and 88.

3. PBGC Op. Letter 82-13 (Apr. 12, 1982).

4. PBGC Op. Letter 86-17 (Aug. 13, 1986).

5. PBGC Op. Letter 83-20 (Sept. 2, 1983).

SEE CASE
FILE FOR
EXHIBITS