UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

FEB 14 2002

MICHAEL W. DOBBINS
CLERK, U S DISTRICT COURT

NESTLE HOLDINGS, INC. and )
NESTLE TRANSPORTATION COMPANY )
         )   Case No. 01 C 5081
        Plaintiffs, )   Judge Elaine E.Bucklo
         )
CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND, )
         )
        Defendant. )

FEB 15 2002

## CENTRAL STATES' PENSION FUND'S MEMORANDUM IN OPPOSITION T NESTLE'S MOTION TO MODIFY AND VACATE IN PART ARBITRATION AWARD, AND IN SUPPORT OF THE PENSION FUND'S MOTION FOR SUMMARY JUDGMENT

James P. Condon
Brad R. Berliner
Attorneys for Defendant
Central States, Southeast and Southwest
Areas Pension Fund
P. O. Box 5123
Des Plaines, IL 60017-5123
(847) 518-9800

February 14, 2001



# TABLE OF CONTENTS

Page(s)

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   Nestle Incorrectly Argues That The Standard Of Review Is *De Novo*. . . . . . . . 2

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   Nestle's termination of the collective bargaining agreements at Oconomowoc and St. Joseph. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.   Nestle's admission that the St. Joseph and Oconomowoc work had been transferred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.   Nestle's demand for arbitration and its disavowal of its prior admission concerning the work transfer. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.   The historic participation of Pension Fund-covered drivers in lanes now handled exclusively by drivers who do not participate in Central States. . . . . 6

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.   The Nature And Purpose Of Withdrawal Liability . . . . . . . . . . . . . . . . . . 7

    B.   Nestle Admitted That It Transferred Pension Fund-Covered Work . . . . . . . . . 8

        1.   John Holloway's May 1995 notes indicate that part of the covered work would "go to common carriers, owner operators or other [non-Pension Fund-covered] company drivers." . . . . . . . . . . . . . . . . . . . 8

        2.   Nestle's senior legal counsel admitted that Nestle transferred the Pension Fund covered work. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3.   Nestle admitted that it transferred Pension Fund covered work in its 1997 request for review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

C.  The Arbitrator Correctly Concluded That, As A Matter Of Fact, Nestle Transferred Work Of The Type For Which Contributions To The Pension Fund Had Been Previously Required. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    1.  The Arbitrator properly concluded that the Pension Fund-covered drivers would have continued to perform work in the over-the-road lanes but for the terminal closures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    2.  The Arbitrator correctly noted that § 1385 poses no quantitative test. . . 16

D.  This Court Should Ignore Nestle's Attempt To Re-write § 1385. . . . . . . . . . . 17

E.  Arbitrator Eisler Properly Refused Nestle's Motion To Strike Exhibits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

Page(s)

CASES

Barnhill v. Johnson,
503 U.S. 393, S.Ct. 1386 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Central Chicago Truck Drivers, Helpers and Warehouse Workers Union
(Independent) Pension Fund v. Louis Zahn Drug Company,
890 F.2d 1405 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Central States Pension Fund v. Johnson,
991 F.2d 387 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Central States Pension Fund v. Nitehawk Express, Inc.,
223 F.3d 483 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.A.M. Nat'l. Pension Fund Benefit Plan C. v. Stockton Tri Indus.,
727 F.2d 1204 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Landry v. AirLine Pilots Ass'n. Int'l. AFL-CIO,
901 F.2d 404 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Mutual Life Ins. Co. v. Hillmon,
145 U.S. 285, 12 S. Ct. 909 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Nachman Corp. v. PBGC,
446 U.S. 359, 100 S.Ct. 1723 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Santa Fe Pacific Corporation v. Central States Pension Fund,
22 F.3d 725 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Upholster's Int'l Union Pension Fund v. Artistic Furniture of Pontiac,
920 F.2d 1323 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7


STATUTES

29 U.S.C. § 1385 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 16, 17, 19

29 U.S.C. § 1401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

Page(s)

## OTHER AUTHORITIES

PBGC Opinion Letter 83-20 (Sept. 2, 1983), 1983 WL 2246 *2 (P.B.G.C.) . . . . . . . . . . 16, 17

PBGC Opinion Letter 86-17, 1986 WL 38796 (P.B.G.C.) (Aug. 13, 1986) . . . . . . . . . . . . . . 18

## CENTRAL STATES' PENSION FUND'S MEMORANDUM IN OPPOSITION TO NESTLE'S MOTION TO MODIFY AND VACATE IN PART ARBITRATION AWARD, AND IN SUPPORT OF THE PENSION FUND'S MOTION FOR SUMMARY JUDGMENT

The Central States, Southeast and Southwest Areas Pension Fund (the "Pension Fund") respectfully submits its Memorandum opposing Nestle's Motion to Modify and Vacate in part the arbitration award granted in the Pension Fund's favor, and in support of the Pension Fund's Motion for Summary Judgment.[1]

The Arbitrator in this case judged the credibility of seven witnesses during the course of a three day hearing. He is the individual chosen by the parties as having expertise in the pension, labor and industrial issues implicated in this case. The relevant statute, 29 U.S.C. § 1401(c), and the entire statutory scheme governing withdrawal liability arbitrations, require that deference be given to the arbitrator's findings of fact under the "clearly erroneous" standard of review. In this case Arbitrator William Eisler found that following the termination of two of its collective bargaining agreements, Nestle Transportation Company ("Nestle") transferred work of the type for which pension contributions under those agreements were previously required. This factual finding compelled the Arbitrator's legal conclusion that Nestle had incurred a partial withdrawal under 29 U.S.C. § 1385(b)(2)(A)(i). The Court should decline Nestle's invitation to sift through the extensive arbitration record and second guess the Arbitrator's factual findings.

---

[1]  Although Nestle's motion appears to be a motion for summary judgment, Nestle has not complied with Local Rule 56.1. Nestle has not filed a statement of material undisputed facts, as required under that rule.

## I. STANDARD OF REVIEW

**1.      Nestle Incorrectly Argues That The Standard Of Review Is *De Novo.***

The Arbitrator's factual findings at issue in this case are reviewable under the "clearly erroneous' standard, not the "de novo" standard suggested by Nestle.   29 U.S.C. § 1401(c).   The Arbitrator's decision that Nestle "transferred" work and incurred a partial withdrawal is a classic application of factual findings to the statutory text -- hence, a mixed question of fact and law, which may only be set aside for "clear error."   Central Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Louis Zahn Drug Company, 890 F.2d 1405, 1411 (7th Cir. 1989) **("Zahn")**; Central States Pension Fund v. Nitehawk Express, Inc., 223 F.3d 483, 488 (7th Cir. 2000).

The entire purpose of the MPPAA arbitration scheme would be undermined by subjecting Arbitrator Eisler's factual findings to de novo review.   As the Seventh Circuit noted in Zahn:

> Congress has expressed a preference for initial resolution of the dispute in a non-judicial forum.   Second, an arbitrator skilled in pension and labor matters, like an agency in a given administrative area, is in theory likely to fashion superior resolutions of disputes within the arbitrator's area of expertise.   Third, initial resort to arbitration, like initial resort to an administrative tribunal, promotes judicial economy both because an arbitrator's decision may dispose of the dispute, and because, even if one party appeals the arbitral decision, courts will have the benefit of the arbitrator's sifting of the facts.

Zahn, 890 F.2d at 1410, quoting I.A.M. Nat'l. Pension Fund Benefit Plan C. v. Stockton Tri Indus., 727 F.2d 1204, 1208 (D.C. Cir. 1984).   The "work transfer" issue which Arbitrator Eisler resolved in this case clearly called for the application of "the special knowledge and expertise of a skilled labor and pension arbitrator." Zahn 890 F.2d at 1411 (citation omitted).

In this case the Arbitrator applied the correct legal standard, and <u>agreed</u> with Nestle's definition of the statutory term "transfer:"

> Nestle argues that the verb used in the statute, "transfer", means "to convey or shift from one person or place to another... Nestle says that there must be a conveyance or shifting from point A to point B and that the shift or conveyance must be by an employer of the control group... Thus far, the Arbitrator agrees with Nestle's contention.

(Arbitrator's Decision and Award, pp. 11-12, Ex. G hereto (hereinafter, "**D&A**, p. _").) Moreover, Arbitrator Eisler himself asserted that he reached his Decision based upon the applicable facts:

> [A]s a matter of <u>fact</u>, there was a transfer of the collective bargaining work . . . to another location. . .

(emphasis added.)

Therefore, Arbitrator Eisler's decision can only be reversed if the Court determines that he was "clearly erroneous."[2]

## II. <u>STATEMENT OF FACTS</u>

### 1. <u>Nestle's termination of the collective bargaining agreements at Oconomowoc and St. Joseph.</u>

Prior to 1995, Nestle Transportation was signatory to collective bargaining agreements covering operations which it designated as truck "terminals" in St. Joseph, Missouri and Oconomowoc, Wisconsin. (D&A, p. 2.) At various times, each of these terminals employed between

---

[2]    Even if this Court were to determine that the Arbitrator committed "clear error," that would not relieve Nestle of its burden to shown "by a preponderance of the evidence that the determination [made by the Pension Fund] was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A).   <u>See also</u> <u>Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust</u>, 508 U.S. 602, 113 S. Ct. 2264 (1993) ( in a withdrawal liability arbitration, the employer bears the burden of proof).   This means that, if after engaging in a <u>de novo</u> review of record (as Nestle urges), this Court were to conclude that the evidence on the "work transfer" issue is ambiguous or in equipoise, the Court should still rule against Nestle.  This is so because under those circumstances, Nestle would have failed to carry its burden of proof.

6 and 10 drivers who hauled trailers containing Nestle products. (D&A, pp. 2-3.) Nestle Transportation's collective bargaining agreements at Oconomowoc and St. Joseph required the company to make contributions to the Pension Fund on behalf of these drivers. (D&A, pp. 2-3.) Part of the work performed by the union drivers at St. Joseph and Oconomowoc consisted of participating with Nestle's non-union employee drivers and independent contractors in handling certain over-the-road "lanes" in which Nestle's freight moved. (Pension Fund's Statement of Material Facts, ¶ 1; hereinafter "SMF, ¶ _".)

On May 25, 1995, Nestle Transportation entered a termination agreement that ended its collective bargaining agreement and obligation to contribute to the Pension Fund with respect to the St. Joseph terminal. (D&A, p. 3.) On September 6, 1995, Nestle Transportation entered a similar termination agreement with respect to the Oconomowoc terminal. (D&A, p. 4.)

Mr. John Holloway, Nestle's vice-president for labor relations, and Mr. Steven Michaels, Nestle Transportation's general manager, were involved in the negotiation of the Oconomowoc and St. Joseph termination agreements. (SMF, ¶ 2.) During May 1995, in preparation for the St. Joseph termination negotiations, Mr. Holloway met with Mr. Michaels to discuss, among other things, "what will happen to the [St. Joseph terminal] business" following the termination of St. Joseph. (SMF, ¶ 3.) According to notes which Mr. Holloway took of his discussions with Mr. Michaels, the "over the road runs will simply **go to** common carriers, owner-operators **or other company drivers**." (SMF, ¶ 4)(Appendix tab A hereto; emphasis added.) These are the same options for handling the work that Nestle had <u>before</u> the St. Joseph termination - - with one important exception: After the St. Joseph termination, Nestle no longer assigned <u>Pension Fund-covered</u> "company drivers" (<u>i.e.</u>, employee drivers) to handle the "over-the-road runs." (SMF, ¶ 5.)

### 2. Nestle's admission that the St. Joseph and Oconomowoc work had been transferred.

In internal correspondence generated in May 1995, Nestle acknowledged that the closures of its St. Joe and Oconomowoc terminals would result in the imposition of withdrawal liability. (D&A, p. 8; SMF, ¶ 6.) However, as Arbitrator Eisler explained, Nestle believed at that time that its withdrawal liability would be only $300,000.00, rather than the $1.2 million which the Pension Fund actually assessed. (D&A, p. 8-9; SMF, ¶ 6.)

On June 12, 1996, William Ferioli, Senior Counsel at Nestle, submitted a "Statement of Business Affairs" to the Pension Fund. Ferioli averred in this statement that, to the best of his knowledge information and belief, Nestle had **"transferred"** work formerly covered by collective bargaining agreements requiring contributions to the Pension Fund. (D&A, p. 9; (SMF, ¶ 9)(Appendix tab B hereto; emphasis added.) Nestle's June 12, 1996 admission in the Statement that the work had been transferred precipitated Central States' March 1997 assessment of withdrawal liability against Nestle in the amount of $1,257,598.41. (D&A, p. 9; SMF, ¶ 18.)

On June 12, 1997, Nestle submitted a "request for review" of the withdrawal liability assessment to the Pension Fund, pursuant to ERISA § 4219(2)(A), 29 U.S.C. § 1399(2)(A). (D&A, p. 9; SMF, ¶ 21)(Appendix tab C hereto.) Nestle asserted in its request that it had **"retained"** a small percentage of work formerly handled by their covered drivers at St. Joe and Oconomowoc. (D&A, p. 9; SMF, ¶ 22; tab C hereto, p. 4.) Moreover, as the Arbitrator noted, Wayne Glover (Nestle Transportation's terminal manager in DeKalb, Illinois) testified at the arbitration hearing that there is "no difference" between the over-the-road work formerly performed by the Pension Fund covered employee drivers, and the work done in the same lanes by non-Pension Fund-covered employee drivers after the Oconomowoc and St. Joseph terminal terminations. (D&A, p. 10; SMF, ¶ 24.)

3. **Nestle's attempt to disavow its prior admission concerning the work transfer.**

On January 12, 1998, Nestle submitted what it called a "revision" to its prior (June 12, 1997) request for review. (SMF, ¶ 25.) Nestle's January 12, 1998 revision stated that in its initial request to review, it had "indicated that the Company transferred **a small amount** of work from Oconomowoc and St. Joseph to another location [which did not contribute to the Pension Fund]." (SMF, ¶ 26; emphasis added.) Nestle's revised request for review went on to assert that "based upon a further review of the facts . . . no work was transferred." (SMF, ¶ 27.)

4. **The historic participation of Pension Fund-covered drivers in lanes now handled exclusively by drivers who do not participate in Central States.**

Nestle has now conceded that with regard to the over-the-road lanes that were formerly handled (in part) by the Oconomowoc and St. Joseph drivers, <u>after</u> the terminations it continued to perform "work of the type for which contributions [to the Pension Fund] were [previously] required . . . ." (D&A, p. 11.)

Nestle's witnesses testified that prior to the Oconomowoc and St. Joe terminations it assigned drivers to various over-the-road lanes on a "random" basis, depending upon the availability and location of the drivers on a particular date. (SMF, ¶ 29.) The assignment of drivers to handle these lanes depended on a computer system that was kept up to date with information concerning each driver's miles, availability and location. (SMF, ¶ 30.) However, as Mr. Steven Michaels (a key Nestle management witness) testified, because there were no longer any Pension Fund-covered drivers remaining to participate after the Oconomowoc and St. Joe terminal closures, it became more likely that the remaining, non-union employee drivers would be assigned to the lanes that were formerly shared with union drivers. (D&A, p. 4, SMF, ¶ 32.) As the Arbitrator noted, "[t]he random nature of the assignments makes certain the conclusion that, but for the terminal closures, Local 460

and 695 drivers would have continued to randomly participate in those [over-the-road] lanes on the same historic basis as they did before the terminal closures." (D&A, p. 16.)

The Pension Fund-covered drivers "participated in certain lanes with substantial regularity along with other Nestle employee drivers," regardless of whether the total number of Nestle employee drivers assigned to those lanes was trending up or down. (D&A, p. 15.) For example, the data relating to the "St. Joe-Friskies to DeKalb" lane shows that in the second quarter of 1994, 70 Nestle employee/drivers made runs from "St. Joe-Friskies" to DeKalb, and 55.7% of those drivers were covered by the Fund. (D&A, p. 8; SMF, ¶ 33.) In the first quarter of 1994, only 13 loads were driven in the "St. Joe-Friskies to DeKalb" lane, but 69.2% of those loads were handled by Fund-covered drivers. (SMF, ¶ 34.) This pattern held true up to mid-1995, when Nestle terminated all of the Fund-covered drivers at St. Joe and Oconomowoc. (SMF, ¶ 35.)

## III. ARGUMENT

### 1. The Nature And Purpose Of Withdrawal Liability

The Multiemployer Pension Plan Amendment Act ("MPPAA") was intended to serve the public policy goals of the Employee Retirement Income Security Act of 1974 ("ERISA"), and specifically to "'prevent[ ] the great personal tragedy suffered by employees whose vested benefits are not paid when pension plans are terminated.'" Central States Pension Fund v. Johnson, 991 F.2d 387, 392 (7th Cir. 1993), quoting Nachman Corp. v. PBGC, 446 U.S. 359, 375, 100 S.Ct. 1723, 1733 (1980).

MPPAA requires each employer participating in a multiemployer pension plan to be responsible for a proportionate share of the plan's "unfunded vested benefits." See, e.g., Upholster's Int'l Union Pension Fund v. Artistic Furniture of Pontiac, 920 F.2d 1323 (7th Cir. 1990). Unfunded vested benefits represent the shortfall between the present value of the pension fund's assets, as

compared to the present value of the <u>vested</u> pension benefits the plan will be obligated to pay out in the future. Thus withdrawal liability helps ensure that there will be sufficient funds to pay the pensions that have been promised and vested.

An employer may trigger withdrawal liability by either completely ceasing to have an obligation to contribute to the multiemployer pension plan, or by incurring a **partial** withdrawal under one of the standards set forth in ERISA § 4205, 29 U.S.C. § 1385. In either case, the purpose of the resulting withdrawal liability is the same: <u>i.e.</u>, to insulate the pension plan from a reduction in its contribution base. <u>See</u> H.R. Rep. No. 869, 96th Cong., 2d Sess., pt. 1 at 68 (1980) ("declines in an employer's contributions to a plan which do not constitute a complete withdrawal may have the same adverse effect on a plan's contribution base and on the funding burden on other employers"). This protection against reductions in the contribution base is evident not only in the case of a partial withdrawal caused by a "70-percent contribution decline" (pursuant to 29 U.S.C. § 1385(b)(1)), but also in the case of partial withdrawals caused by a facility closure or collective bargaining agreement termination (pursuant to 29 U.S.C. § 1385(b)(2)).

### 2. Nestle Admitted That It Transferred Pension Fund-Covered Work

1. John Holloway's May 1995 notes indicate that part of the covered work would "go to common carriers, owner operators or other [non-Pension <u>Fund-covered] company drivers</u>."

Under ERISA § 4205(b)(2)(A)(i), 29 U.S.C. § 1385(b)(2)(A)(i), a partial withdrawal is triggered if Nestle ceased to perform work covered by the St. Joe or Oconomowoc collective bargaining agreements, and "transferred" work "of the type for which contributions" to the Pension Fund were previously required. Section 1385(b)(2)(A)(i) provides:

(2)(A) There is a partial cessation of the employer's contribution obligation for the plan year if, during such year --

> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or **transfers** such work to another location. . .

(emphasis added.)

John Holloway was Nestle's Vice President for Labor Relations. In May 1995, Holloway -- in preparation for a meeting with the St. Joe drivers concerning the impending termination -- made notes concerning what would happen to the drivers' work. (D&A, p. 8; SMF, ¶¶ 2-4; tab A hereto.) Holloway's notes state that after the termination of the St. Joe drivers, the "over the road runs will simply **go to** common carriers, owner operators and **other company drivers**." (D&A, p. 8; SMF, ¶ 4; tab A hereto ; emphasis added.) It is undisputed that the "other company drivers" who now handle the runs formerly handled (at least in part) by the St. Joe or Oconomowoc drivers are drivers for whom Nestle does not have an obligation to contribute to the Pension Fund. (D&A, p. 4.)

Arbitrator Eisler interpreted the notes as conclusive evidence that Mr. Holloway and Mr. Michaels were aware that the work of the Pension Fund-covered drivers was being transferred to another location:

> Of course, the notes of the Vice President for Labor Relations [(Holloway)] conclusively show that he and the General Manager for Nestle Transportation Company knew that the over-the-road work of the St. Joseph and Oconomowoc drivers would go to common carriers, independent operators and "other company drivers." Regardless of whether there was an *intent* to transfer this work to another location, prior knowledge that other company drivers would perform the work was undoubtedly present.

(D&A, p. 15, n. 4 (emphasis in original).) Nestle's December 10, 201 Memorandum filed with this Court has failed to mention Holloway's notes. Further, the testimony of Steve Michaels (Nestle's Transportation Manager) follows directly from Holloway's notes. Michaels testified that the elimination of the Fund-covered drivers made it more likely that the remaining drivers in the pool

(owner operators and <u>non</u>-Fund-covered employee drivers) would receive the remaining over-the-road work. (SMF, ¶ 32.)

    2.    Nestle's senior legal counsel admitted that Nestle transferred the <u>Pension Fund covered work.</u>

In May 1996, William Ferioli, one of Nestle's senior in-house attorneys, responded to a questionnaire from the Pension Fund concerning the St. Joe and Oconomowoc terminations. Mr. Ferioli's response (which was given under oath) states that Nestle had "transferred" the St. Joe and Oconomowoc work. (D&A, p. 9; SMF, ¶ 9; tab B hereto, p. 6.) Ferioli's response was based upon his conversation with the two representatives of Nestle who were most familiar with the termination of the St. Joe and Oconomowoc employees -- Steve Michaels (Nestle Transportation's general manager) and John Holloway (Nestle's vice-president for labor relations). (SMF, ¶ 10.) Ferioli's contemporaneous notes and voice-mail messages concerning these conversations indicate that the work formerly performed by the Pension Fund-covered drivers

> went into the [Nestle Transportation] system so it's managed through DeKalb [Illinois], as owner-operators and company drivers go thru those areas, <u>they just do the business</u>. The same thing is true for Oconomowoc. <u>Probably a little less than half of the business we retained and just did with system drivers out of DeKalb and throughout the network.</u>

(SMF, ¶ 11 (emphasis added).) Of course, the "company drivers" to whom this business went were not covered by the Pension Fund. (SMF, ¶ 14.) Therefore, Ferioli's conversations with Holloway and Michaels (as confirmed in Ferioli's notes taken in May 1996) provided a solid basis for his assertion in the "Statement of Business Affairs" that the work had been "transferred."

    3.    Nestle admitted that it transferred Pension Fund covered work in its 1997 <u>request for review.</u>

Nestle's June 12, 1997 "request for review" of the withdrawal liability assessment constituted another written admission by Nestle that it had transferred work formerly covered by the applicable bargaining agreements.[3]  In that request, Nestle admitted that it had "retained" at least some of the work formerly handled by the Fund-covered drivers.  (D&A, p. 9; SMF, ¶ 22, tab C hereto, p. 4.) Nestle later confirmed, in its January 12, 1998 "revised" request for review, that by "retained" (as phrased in its original request) it meant that it had "transferred a small amount of work from Oconomowoc and St. Joseph to another location (not contributing to the Fund)."  (SMF, ¶ 26; emphasis added.)

Nestle 's written statements in 1995 and 1996 that the work would "go to...other company drivers" and that the work was in fact "transferred" to those drivers are more trustworthy than Nestle's more recent efforts to deny that a transfer occurred.  As Arbitrator Eisler noted, Nestle's 1995 and 1996 documents were written at a time when Nestle did not realize that the admission of a transfer of work would result in the assessment of $1.2 million in withdrawal liability; Nestle's management had originally estimated that any withdrawal liability would be only $300,000.00. (D&A, p. 9; SMF, ¶ 17.)  Only after Nestle received the March 1997 notice and demand for $1.2 million in withdrawal liability did Nestle begin to disown its original written statements indicating that the work had been transferred.  (Id.)

More than 100 years ago the U.S. Supreme Court noted that a person's testimony concerning his or her own intent

---

[3]    MPPAA requires an employer who seeks to contest a withdrawal liability assessment to submit a request for review to the pension fund that issued the assessment.  29 U.S.C. § 139(b)(2).

> at a former time is no more likely to be clear and true than a bystander's recollection of what he then said, <u>and is less trustworthy than letters written by him at the very time and under circumstances precluding a suspicion of misrepresentation.</u>

<u>Mutual Life Ins. Co. v. Hillmon</u>, 145 U.S. 285, 295, 12 S. Ct. 909, 912 (1892) (emphasis added).

<u>See also</u> <u>Santa Fe Pacific Corporation v. Central States Pension Fund</u>, 22 F.3d 725, 729 (7th Cir. 1994) ("internal documents," "notes" and other contemporaneous written evidence deemed more reliable than after-the-fact oral explanations).

**3.      The Arbitrator Correctly Concluded That, As A Matter Of Fact, Nestle Transferred Work Of The Type For Which Contributions To <u>The Pension Fund Had Been Previously Required.</u>**

As previously explained, for this Court to overturn Arbitrator Eisler's decision, Nestle must demonstrate that the Arbitrator's findings were "clearly erroneous." The Arbitrators' factual findings and the evidentiary record confirm that Nestle did, in fact, transfer the work.

> **1.      The Arbitrator properly concluded that the Pension Fund-covered drivers would have continued to perform work in the over-the-road lanes but for the terminal closures.**

Nestle claims that there cannot be a transfer of work because the work attributable to the Pension Fund-covered drivers was not identified prior to the alleged transfer. (Nestle December 10, 201 Memo, p. 12.) Yet Nestle then contends (without ever producing any supporting evidence) that <u>after</u> the terminal closures, <u>all</u> of the work which Nestle lost was Pension Fund-covered work. (<u>Id</u>., pp. 13-14.) Of course, Nestle fails to explain why it was impossible to identify the work of the Pension Fund-covered drivers <u>prior</u> to the closures, but easy to identify any work that was lost <u>after</u> the St. Joe and Oconomowoc closures as work that formerly belonged to the Pension Fund-covered drivers. For Nestle, the Pension Fund-covered drivers had no "identified" work, <u>until</u> those drivers were terminated.

Not surprisingly, the Arbitrator deemed Nestle's suggestion to be illogical:

> Whether the work was identified at all, seems of little relevance since the evidence
> was that it was assigned in the same manner both before and after the terminal
> closures. It was no more identified before the terminal closures than it was afterward.
> The assignment of the work was randomly made both before and after the terminal
> closures. Identification is possible only by use of hindsight to see which class of
> drivers received the assignment to haul freight in a particular lane.

(D&A, pp. 12-13; emphasis added.) As Arbitrator Eisler explained, "[t]he sharing of the over-the-road lanes was on a randomly assigned basis both before and after the terminal closures." (Id. at p. 7, emphasis added.) The Arbitrator concluded that, since the Fund-covered drivers shared the work in the over-the-road lanes prior to the terminal closures, and since Nestle used the same method of randomly assigning work both before and after the terminal closures, it logically follows that (but for the terminal closures) the Pension Fund covered drivers would have continued to participate in the shared over-the-road lanes after the terminal shutdowns. Referring to these basic facts, Arbitrator Eisler wrote:

> Nestle Transportation Company employee drivers, owner operator drivers and
> common carrier drivers, none of whom were covered by Nestle contributions to the
> Pension Fund, continued to drive on randomly selected basis in the same over-the-
> road lanes in which they, together with Local 460 and 695 drivers, had driven prior
> to the terminal closures. The same factors and criteria were utilized for the selection
> of drivers to operate in the over-the-road lanes after the terminal closures as was used
> before the terminal closures. After the terminal closures, the only difference in the
> factors used in the selection of drivers for the hauling of Nestle product was that
> drivers covered by collective bargaining agreements with Local Nos. 460 and 695
> requiring contributions to the Pension Fund were no longer in the available pool of
> drivers.

(D&A, p. 4; emphasis added.) Arbitrator Eisler also noted that Nestle's "random" assignment method did not discriminate between Fund-covered and non-covered drivers in assigning work. (D&A, pp. 15-16.) These facts led Arbitrator Eisler to conclude that the Fund-covered drivers would have continued to share work with non-Fund covered drivers:

> The random nature of the assignments makes certain the conclusion that, but for the
> terminal closures, Local 460 and 695 drivers would have continued to randomly

-13-

participate in those lanes on the same historic basis as they did before the terminal closures.

(D&A, p. 16, emphasis added.) Because the Fund-covered drivers "historic[ally]" shared lanes with "non-exclusive regularity" prior to the terminal closures, and because non-Fund-covered drivers participated in those shared lanes after the closures, the Arbitrator concluded that "there was, in fact, a transfer of work". (D&A, p. 13, 15; emphasis added.)

Although the statute does not require specification of any particular amount of continued or transferred work, the evidence does permit reasonable approximation on this point. For example, during the five (5) of the seven (7) quarters ranging from the first quarter of 1994 to the third quarter of 1995 (just before the termination of the Oconomowoc collective bargaining agreement), the Pension Fund-covered drivers participated, along with owner operators and non-Fund-covered employee drivers, in handling loads in the Oconomowoc to DeKalb lane. (SMF, ¶ 43.) For these seven quarters, the Pension Fund-covered drivers averaged 8.75% of the loads driven by all employee drivers in this lane (both covered and non-covered). (SMF, ¶ 44.) Based upon this historical pattern, it would be reasonable to expect that in the quarter after the termination of the Oconomowoc collective bargaining agreement (i.e., the fourth quarter of 1995), the Fund-covered drivers would have handled 8.75% of the total loads driven by the remaining (non-Pension Fund-covered) employee drivers, but for the termination of the Oconomowoc collective bargaining agreement. As it turned out, the non-Fund-covered employee drivers handled 29 loads in the Oconomowoc to DeKalb lane in the fourth quarter of 1995. (SMF, ¶ 45.) Based upon the historical pattern during the relevant period, 2.5 of these loads would probably have gone to Fund-covered drivers if they had not been terminated (29 total employee driver loads x 8.75% average for loads driven by Pension Fund-covered drivers = 2.5 loads).

Similar calculations can be made based upon the historic pattern of participation of the Pension Fund-covered drivers in the other "shared" lanes. (See Arb. Ex. 61 - - "St. Joseph to DeKalb," "Oconomowoc to Itasca," "Oconomowoc to Waverly," "St. Joseph Friskies to Yoder," "St. Joseph Friskies to DeKalb," and "St. Joseph to Yoder.")

This accords with the testimony of Wayne Glover, one of Nestle's terminal managers, who stated that it was likely that if the St. Joe and Oconomowoc drivers would not have been terminated, they likely would have continued to participate in the over-the-road lanes. (SMF, ¶ 24.) Therefore, given the fact that non-Fund-covered employee drivers continued to receive work in the previously shared lanes, the Arbitrator was able to conclude that Nestle, in fact, transferred the former Fund-covered work (i.e., the historical pattern of participation) to another location.

However, Nestle argues that if the "aggregate" number of loads hauled by employee drivers after the terminal closures is less than the "aggregate" number of loads hauled by Fund-covered drivers prior to the terminal closures, Nestle cannot be said to have effected a partial withdrawal. (Nestle's December 10, 2001 Memo, pp. 13, 17-18.) This argument ignores the testimony of Nestle's own witnesses, who stated that Nestle regarded each lane as a "separate piece of business." (SMF, ¶ 36.) Therefore, the proper focus is on individual lanes.

Moreover, certain lanes experienced increases in the number of hauls by (non-Pension Fund-covered) employee drivers after the terminal closures. (SMF, ¶ 36; tab D hereto.) For example, Pension Fund-covered employee drivers handled 40.7% of the loads handled by all Nestle employee drivers in the St. Joe/Friskies to DeKalb lane from the third quarter of 1993 until the May 1995 St. joe termination. (SMF, ¶ 37.) In the first quarter of 1994, 13 loads were handled by Nestle employee drivers in this lane, and 9 of those 13 were handled by Fund-covered drivers. (SMF, ¶ 38.) Yet, immediately after the termination of the St. Joseph agreement (in the third quarter of 1995), Nestle's

-15-

(non-Fund covered) employee drivers more than doubled the number of loads hauled in the St. Joe-Friskies to DeKalb lane, from 13 to 29. (SMF, ¶ 39.) Thus, Pension Fund-covered drivers would probably have increased their participation (compared to the percentage of total loads they handled in first quarter of 1994) based upon this same data.[4]

2.    <u>The Arbitrator correctly noted that § 1385 poses no quantitative test.</u>

The Arbitrator confirmed that 29 U.S.C. § 1385(b)(2)(A)(i) poses no <u>quantitative</u> test with regard to the continuation of work. (D&A, p. 14.) A partial withdrawal occurs if the employer continues to perform <u>any</u> "work" previously covered under a terminated the labor agreement. The Pension Benefit Guarantee Corporation (the agency charged with administering MPPAA) has confirmed this point:

> [W]hen an employer closes one terminal and shifts the work of that terminal to other terminals which are covered by other collective bargaining agreements under which contributions are made to the plan, there is no partial cessation of the employer's contribution obligation under Section 4205(b)(2)(A)(i) on account of the shift. If, however, any of the work is shifted to a location where contributions are not required to the plan, then a partial cessation of the employer's obligation will occur.

PBGC Opinion Letter 83-20 (Sept. 2, 1983), 1983 WL 2246 *2 (P.B.G.C.) (emphasis added)(Appendix tab E hereto). Thus for Nestle to have effected a withdrawal under the statute, it only needed to transfer a single load.

Ignoring the language of the statute and the relevant PBGC Opinion Letter, Nestle <u>admits</u> that it transferred Pension Fund-covered work, but says that this transfer of work should be ignored because of its <u>de minimis</u> effect:

---

[4]     The total number of loads driven by employee (Fund-covered and non-Fund-covered) in the St. Joe/Friskies to DeKalb lane fluctuated from quarter to quarter both before and after the St. Joe terminal closure. (Arb. Ex. 71.) Therefore, one quarter before the terminal closure offers as good a point of comparison as any other.

> Where the Local 460 and Local 695 drivers had no claim to any particular lane assignments, <u>any shift in assignments to particular lanes from a Local 460 or Local 695 driver to a non-Fund employee driver</u> that did not increase the amount of work performed by non-Fund drivers in the aggregate is no more than a *de minimis* effect of the closures on the work of the remaining employee drivers and is not evidence that Nestle transferred work in the jurisdiction of the Local 460 and Local 695 CBAs from one group of employees to another.

(Nestle December 10, 2001 Memorandum, pp. 18-19; emphasis added.) The very definition of the word "shift" confirms that Nestle transferred work within the meaning of § 1385. To "shift" is "[t]o move or transfer from one place or position to another." (www.dictionary.com/cgi-bin/dict.pl?term=shift). Furthermore, the PBGC used the word "shift" synonymously with "transfer" in the above-cited Opinion Letter 83-20.

**D.**      <u>**This Court Should Ignore Nestle's Attempt To Re-write § 1385.**</u>

The exact language of 29 U.S.C. § 1385(b)(2)(A)(i) should be kept in mind:

> (2)(A) There is a partial cessation of the employer's contribution obligation for the plan year if, during such year --

> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location. . .

The statutory language does not provide (as Nestle argues) that the "work in the jurisdiction of the collective bargaining agreement" must be <u>exclusively</u> performed by union workers for an employer to effect a withdrawal. Nor does the statute require the covered work to be "specifically identifiable."

The essence of the applicable statute is to trigger a partial withdrawal if the employer both terminates a given collective bargaining agreement requiring pension contributions, and <u>continues</u> to perform work of the type for which contributions were previously required:

> It is important to emphasize and to understand that in no case do these rules impose liability on an employer for merely ceasing or terminating an operation; rather, they address only situations where work of the same type is <u>continued</u> by the employer but for which contributions to a plan which were required are no longer required.

Statement by Rep. Frank Thompson, Jr. (D-NJ), House debate, August 25, 1980, reprinted in Pension Reporter (BNA), Special Supplement No. 310, p. 43 (September 29, 1980) (emphasis added). The Pension Benefit Guarantee Corporation has cited with approval the exact same comments from Congressman Thompson quoted above. <u>See</u> PBGC Opinion Letter 86-17, 1986 WL 38796 (P.B.G.C.) (Aug. 13, 1986)(Appendix tab F hereto).

In light of the type of "work" at issue in this case (<u>i.e.</u>, work that was shared on a random basis by covered and non-covered employees before the collective bargaining agreement termination), there is no difference between saying "the terminated work <u>continued at</u> another location" and saying "the terminated work was <u>transferred to</u> another location." The continuation of the work under these circumstances simply represents a transfer to the non-covered employees of the share or percentage of the work that otherwise, but for the termination of the collective bargaining agreement, would have gone to the employees covered by the Pension Fund.

The drafters of the statute used the word "transfer" to emphasize that a partial withdrawal would be triggered regardless of <u>where</u> the formerly covered work was continued by the employer following the termination of the bargaining agreement -- either within the jurisdiction of the terminated agreement or elsewhere. Further, the withdrawal liability provisions of ERISA should be <u>broadly</u> construed to effect their remedial purpose. <u>See, e.g.</u>, <u>Landry v. AirLine Pilots Ass'n. Int'l. AFL-CIO</u>, 901 F.2d 404, 417 (5th Cir. 1990) ("ERISA is therefore to be construed liberally . . . to preserve the integrity of fund assets.")

The Pension Fund believes that this meaning of a "transfer of work" is evident under the express language of 29 U.S.C. § 1385(b)(2)(A)(i). But even if the Court were to conclude that there is an ambiguity in the phrase "transfers the work," the above-quoted legislative history (indicating that the drafters of the statute were intent upon triggering a partial withdrawal whenever an employer terminated work covered by a pension fund, and then continued to perform that type of work) resolves any such ambiguity. See, e.g., Barnhill v. Johnson, 503 U.S. 393, 401, 112 S.Ct. 1386, 1391 (1992) (appeals to legislative history are well taken to resolve statutory ambiguity). Nestle has now conceded that it continued to perform the terminated work; it simply insists, however improbably, that a continuation of work at another location is somehow different from a "transfer" of work to that location.

Further, even if 29 U.S.C. § 1385 were to be interpreted to require that the work covered under the applicable agreement be "identified," the Arbitrator's decision would still be correct. Arbitrator Eisler identified the work of the Fund-covered drivers as the historic participation with substantial regularity in certain over-the-road lanes. As the Arbitrator ruled, the Fund-covered drivers "historically participated in certain lanes with substantial regularity along with other Nestle employee drivers." (D&A, p. 15.)

**E.      Arbitrator Eisler Properly Refused Nestle's Motion To Strike Exhibits.**

Nestle's contention that the Arbitrator should have stricken certain exhibits fails to take notice of the regulations governing the arbitration hearing:

> The arbitrator determines the relevance and materiality of the evidence offered during the course of the hearing and is the judge of the admissibility of evidence offered. Conformity to legal rules of evidence is not necessary.

29 C.F.R. § 4221.5(a)(3) (emphasis added). The Arbitrator was vested with discretion to determine the admissibility of evidence at the hearing, and Nestle has no grounds to seek reversal of the Arbitrator's determination as to the admissibility of evidence.

Moreover, Arbitrator Eisler explained the relevance of Exhibits 60-68, 70-75 and 101:

> [T]hese exhibits have a bearing on the conduct of Nestle in moving its product in certain lanes both before and after the termination of the union agreements in this case and tend to prove or disprove facts germane to the case and are relevant to the issues that must be decided . . . Exhibit 101 is a deposition of an employee of Nestle who testified as to the business reasoning underlying Nestle's reorganization efforts. It contains information which arguably supports the Fund's position that work was transferred to another location.

(D&A, p. 5-6.) Exhibit 101 (the transcript of the deposition of Rob Iverson) is relevant because Mr. Iverson testified that it was Nestle's overall philosophy in its reorganization efforts to "shut down those small facilities in out-of-the-way areas and bring them back [i.e., transfer them] into core markets." (Ex. 101, p. 59 (emphasis added)). These exhibits were relevant under any standard. See, e.g., Fed. R. Evid. 401 (evidence is "relevant" if it tends to make the existence of a material fact more probable).

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, the Pension Fund respectfully requests that this Court grant its Motion for Summary Judgment, deny Nestle's Motion to Modify and Vacate the Arbitrator's Decision and Award, and uphold Arbitrator Eisler's Decision and Award.

Respectfully submitted,

James P. Condon
Brad R. Berliner
Attorneys for Defendant
Central States, Southeast and
Southwest Areas Pension Fund
P.O. Box 5123
Des Plaines, IL 60017-5123
(847) 518-9800, Ext. 3467

February 14, 2002

# APPENDIX

# SEE CASE FILE FOR EXHIBITS