Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5081 | **DATE** | 5/22/2002 |
| **CASE TITLE** | Nestle Holdings, et al. vs. Central States, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Plaintiffs' motion to modify and vacate in part arbitration award is denied. The arbitrator was correct to find partial withdrawal liability. Because Nestle does not contest the amount, the award is affirmed. Enter Memorandum Opinion and Order. Any pending motion in this case is terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 23 2002 | |
| | Docketing to mail notices. | | date docketed | 33 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 5/22/2002 | |
| MPJ | courtroom deputy's initials | | date mailed notice MPJ | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NESTLE HOLDINGS, INC. and )
NESTLE TRANSPORTATION COMPANY, )
)
)
Plaintiffs, )
)
v. ) No. 01 C 5081
)
CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND, )
)
Defendant. )

DOCKETED
MAY 2 3 2002

## MEMORANDUM OPINION AND ORDER

More than a million dollars at issue in this case depends on the meaning of the word "transfer." Nestle Transportation Company ships the products of Nestle Holding Companies (collectively "Nestle") by truck. In 1995, it partially withdrew from two collective bargaining agreements with the Union Locals of the International Brotherhood of Teamsters (the "Teamsters"), closing two shipping terminals and letting go the Fund-covered union drivers who had worked under the CBAs. The local runs over the same road lanes that had been driven by covered unionized drivers were then performed by nonunion common carriers, owner operators, or Nestle employees, but Nestle made no contributions to the Central States, States, Southeast and Southwest Areas Pension Fund (the "Fund") for these nonunion drivers, who were not covered by the Fund. The Fund assessed almost $1.3 million in ERISA partial withdrawal liability under the Multiemployer Pension Plan Amendment



Act ("MPPAA"), 29 U.S.C. § 1385(b)(2)(A)(i). Nestle paid but demanded arbitration, arguing that as a matter of law the work was not "transferred," and so the imposition of withdrawal liability was unjustified. The arbitrator disagreed, and Nestle appeals. I affirm.

The arbitrator made the following determinations of fact, which I must accept unless clearly erroneous. Nestle moves its products in part by truck, about 80% by common carrier and 20% through the Nestle Transportation Company, which in mid-1995 had roughly 275 owner operator drivers and slightly over 200 employee drivers, some of whom were represented by the Teamsters. Local Union 460 represented eight drivers at the Nestle Terminal in St. Joseph, Missouri, and Local Union 695 represented three drivers at the Nestle terminal in Oconomowoc, Wisconsin. Both contracts required that Nestle make pension contributions to the Fund. Three of these St. Joseph and two of the Oconomowoc union drivers drove "local lanes," and the other union drivers drove "over-the-road" lanes. In practice, the local lanes were operated exclusively by covered union drivers, and the over-the-road lanes were shared with nonunion drivers who were not covered. All classes of drivers drove over the road lanes on a randomly selected basis depending on factors such as the availability or location of the driver or his hours driven under government regulations.

In June and September of 1995, these two terminals were closed and the union contracts terminated pursuant to an agreement with the Teamsters. The drivers affected were let go. Afterwards, the local runs were performed by common carriers, owner operators, or Nestle employee drivers, all nonunion. The assignments to these lanes were made on the same randomly selected basis that the assignments to the over the road lanes had been before the union contracts were terminated and the terminals closed. The only difference was that there were no union drivers in the pool. Nestle's records showed that covered union drivers drove the Oconomowoc to Waverly, Iowa, lane in the second quarter of 1995, but noncovered nonunion drivers drove this lane during the first quarter of 1996, and that covered union drivers drove the St. Joseph-DeKalb, Illinois route in the second quarter of 1995; 55% of the drivers on that route in that period required Fund contributions; in the preceding quarter, it was 69%. The figures for Oconomowoc-DeKalb were similar. After September 1995, of course, no union drivers made these runs.

Nestle filled out a form sent to it by the Fund answering "yes" to the question whether "bargaining unit work was transferred." Apparently Nestle expected withdrawal liability, but in the amount of perhaps $300,000. When the Fund assessed $1,257,598.41 in March 1997, Nestle submitted a "request for review," asserting that "the short haul operations" out of

Oconomowoc and St. Joseph "effectively ceased upon the terminals' closings." Nestle said that some of the long haul work was "retained," and although it stated that this work was not the "same" as the work formerly handled from the closed terminals, Nestle's DeKalb manager admitted at the hearing that there was no difference. Nestle submitted a revised statement stating that "upon further review of the facts," the work had not been transferred.

The MPPAA requires that a company that withdraws from a multiemployer pension plan covered by ERISA must pay "withdrawal liability," which is intended to cover that company's share of the unfunded vested benefits that exists when it withdraws. 29 U.S.C. §§ 1381, 1385, 1391. Withdrawal liability is "intended to assure that departing employers bear their fair share of pension payments, and do not leave others holding the bag," *Central States, Southeast and Southwest Areas Pension Fund v. Nitehawk Exp., Inc.*, 223 F.3d 483, 487 (7th Cir. 2000), and in particular to avoid "a domino effect that, 'much like a bank run,' could leave the [Fund] unable to pay its vested obligations," *Central States, Southeast and Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 204 F.3d 736, 739 (7th Cir. 2000). Withdrawal liability may be assessed if the employer makes a complete withdrawal from an ERISA plan, 29 U.S.C. § 1383, or if there is a partial withdrawal, § 1385. This is a partial withdrawal case. The relevant provision at issue here is § 1385(b)(2)(A)(i), which states that withdrawal liability

arises when the employer "transfers . . . to another location" work that was performed under a collective bargaining agreement that has been, so far as the transferred work goes, terminated.[1] The question in this case is whether the covered unionized work that Teamster drivers formerly did for Nestle out of St. Joseph and Oconomowoc has been "transferred" within the meaning of § 1385.

The parties debate, among other things, the standard of review. Under ERISA, my review of an arbitrator's conclusions of law is de novo. *Central States, Southeast and Southwest Areas Pension Fund v. Midwest Motor Exp., Inc.*, 181 F.3d 799, 804 (7th Cir. 1999); *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 212 (7th Cir. 1989) (Courts may "fully review an arbitrator's legal determinations."). By statute, my review of an arbitrator's factual findings is highly deferential: "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made

---

[1] The provision reads in full:

> There is a partial cessation of the employer's contribution obligation for the plan year if, during such year--(i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required or transfers such work to another location . . . .

29 U.S.C. § 1385(b)(2)(A)(i).

by the arbitrator were correct." 29 U.S.C. § 1401(c); *Chicago Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1409 7th Cir. 1989). Mixed questions of law and fact I review for clear error. *Nitehawk Exp.*, 223 F.3d at 488. The Seventh Circuit has acknowledged the "practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' . . . [may] turn[] on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Louis Zahn Drug Co.*, 890 F.2d at 1410. It holds that "when the issue is one that requires either fact-finding expertise or where the arbitrator's special expertise in the area of pension law can contribute significantly to the decision, substantial deference ought to be given to the decision of the arbitrator." *Id.* at 1411.

Here, Nestle does not dispute that if "transfer" means what the Fund says it does, then the arbitrator would have correctly applied the law to the facts. Nestle argues instead that the arbitrator erred in understanding the meaning of the term "transfer" in the statute, while the Fund argues that he got it right. We do not, therefore, have a mixed question of fact and law, concerning the application of undisputed law to a set of facts, *id.* at 1409 (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) ("[M]ixed questions of law and fact [are] questions in which

-6-

the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."). We have a pure question of law to be reviewed de novo. I bear in mind that the arbitrator has special expertise in the area of pension law, but I am as well able to interpret statutory language as he, and I do so using plenary review.

I address two preliminary matters. First, Nestle asks that I find the arbitrator erred in refusing to strike certain evidence as irrelevant. To the extent that certain testimony might have been irrelevant but was not relied upon, the arbitrator did not err in admitting it to the record. Insofar as the arbitrator relied (or I rely) on any of this evidence, notably that concerning whom Nestle assigned to which lanes after the closures, this was because it was thought to be relevant, as explained in the appropriate place.

Second, the Fund argues that I should treat certain of Nestle's earlier statements as admissions that the work was transferred within the meaning of the statute. In particular the Fund argues that the arbitrator treated the notes of John Holloway, Vice President for Labor Relations, made in May 1995, as "conclusive" on this question. But the arbitrator wrote that the notes in question "conclusively show that [Nestle] knew that the over-the-road work of the [affected union] drivers would go to

common carriers, independent operators, and other company drivers." Whether that constitutes a transfer within the meaning of the law is a further question.

The Fund also contends that it was an admission that the work was transferred when Nestle's in-house counsel checked the "yes" box in answer to the question whether the work had been transferred in its Statements of Business Affairs in 1996, Def. Ex. B at 6. The arbitrator did not in fact treat this statement as an admission, although he did imply, without expressly so finding, that the facts suggested that Nestle changed its tune on whether the changes in work involved a transfer when it learned that this would mean almost a million dollars more in withdrawal liability than it had originally anticipated. The Fund argues that there is law suggesting that contemporaneous statements may be more reliable than post hoc explanations when there is a motive to misrepresent, see *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 295 (1892), but this case is not apposite, even though Nestle points to no relevant factual discoveries that induced it to change its mind. Nestle is right that this is a legal question. One can admit a legal fact, but if the law plainly indicated that no liability existed, it would be unjust to hold Nestle to its initial word. Besides, the Fund would not want employers to routinely deny that they ever transfer work. Therefore I decline to find that Nestle has admitted that there was a transfer.

The principal issue is the meaning of "transfer" in § 1385(b)(2)(A)(i). The parties say that this is a matter of first impression, and I cannot find any federal case law interpreting the ERISA provision at issue, although there are several Opinion Letters by the Pension Benefit Guaranty Corporation ("PBGC"), the agency delegated the authority to administer the MPPAA, to which the arbitrator and the parties refer. I must therefore proceed first from general principles of statutory interpretation. Here the basic rule is that plain statutory language governs, see *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 604 (7th Cir. 1999),[2] a principle rightly insisted upon by Nestle and the Fund.

Nestle's central argument is as follows. First, a PBCG Opinion Letter 87-17 (Aug. 13, 1986), Def. Ex. 3, says that work formerly done by pension fund covered employees but taken up by third parties is not "transfer[red] . . . to another location within the meaning of [§ 1385(b)(2)(A)(i)]," because the law covers situations where "work of the same type is continued by the employer but for which contributions to a plan . . . are no longer

---

[2] See *Lexington Ins. Co. v. Rugg & Knopp*, 165 F.3d 1087, 1091 (7th Cir. 1999) (plain meaning governs in statutory interpretation). The extremely unusual "exception to the plain meaning rule [is] the 'rare case[] [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *Pittway Corp. v. United States*, 102 F.3d 932, 936 (7th Cir. 1996) (citation omitted). Neither party argues that that a literal reading would "'lead to an absurd result or thwart the purpose of the overall statutory scheme.'" *Castellon-Contreras v. INS*, 45 F.3d 149, 153 (7th Cir. 1995) (citation omitted).

required." The PBGC understood "work of the same type" to mean in part work done "at another of its own locations." Therefore I am to consider only the Nestle employee drivers and not the independent owner operators. I agree with the PBGC's construction.

Second, "transfer" is a transitive verb that takes an object: someone transfers something. It means "to convey [something] from one person, place, or situation to another." *Webster's Ninth New Collegiate Dictionary* 1253 (1990). Here, Nestle says, there was no identifiable object. This is because the work "in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required," in the language of the statute, was defined by the domicile of the drivers doing the work. With regard to the long distance lanes, there was no way to identify any work in those jurisdictions once the St. Joseph and Oconomowoc terminals were closed. Moreover, Nestle says, nothing was conveyed. After the closures, the local lanes were no longer driven by any Nestle employees, and that work was being done by third party outsiders, and so, under the PBGC Opinion Letter, it did not involve a transfer. And the long distance lanes driven by Nestle employees did not increase in the number of runs after the closures; therefore, Nestle contends, there was no transfer here either.

This is a nice piece of statutory interpretation. However, the arbitrator correctly located the main problem with Nestle's

-10-

reasoning. This is the assumption that a transfer must involve a *previously identifiable* thing transferred. The statute says no such thing. The arbitrator noted that the work was assigned in the same way before and after the closures, that is, on the basis of efficiency, driver availability, location, and remaining regulated hours of the drivers. Therefore, the arbitrator correctly found, "whether the work was identified at all seems of little relevance. . . . Identification is possible only by use of hindsight to see which class of drivers received the assignment to haul freight in a particular lane."

Nestle suggests that this violates the grammar of the word "transfer," but English syntax does not involve the ontological commitment to a pre-existing entity that must already somehow be if it is to be transferred. "Work" is an abstract relation identifiable only functionally (who has done what) and not a material substance that has an independent existence or that can be moved from place to place like a ball. The arbitrator was certainly correct that nothing in the law or in the logic or grammar of the word "transfer" compels Nestle's preferred reading in this context.

In addition, the Fund is right to point out that there is a tension between Nestle's argument that before the closing it was not possible to identify what work fell under the union contract, but it was possible to say that after the closures that the remaining work was all identifiably outside the jurisdiction of the

-11-

former contract, and so had not been transferred from covered union work. Nestle is trying to have it both ways. The work was assigned in the same manner and was not essentially different in character, so it was either identifiable (post hoc or ex ante) both before and after the closures or neither before nor after.

Finally, Nestle's argument that the work was not identifiable because it was defined by the jurisdictions of the former contracts would seem to prove too much. If Nestle means that because the statutory language "such work" refers to "work in the jurisdiction of the collective bargaining agreement," as defined by the domicile of the affected drivers, but there was no such work after the collective bargaining agreement was affected, then the statute would be directly self-defeating: there could never be partial withdrawal liability under this section because the termination of the contractual obligation which is the precondition of such liability would destroy the ability to identify the work purportedly transferred.

If, somewhat more plausibly, Nestle's point is that work assigned by this method is not identifiable ex ante, that is correct, in the sense that because the assignment is random, or in any case depends on contingent factors not otherwise than merely statistically predictable, one could not say before the assignments were actually made which work would go to a covered union driver. However this also proves too much: if that is a reason to deny

partial withdrawal liability, then any employer can insulate itself from such liability by the simple expedient of adopting such a method of assigning work. I do not believe that this reflects the intent of Congress or comports with the purpose of the statute. Because it is also not required by the language of the statute, I do not accept this reading.

Nestle objects that the arbitrator employed a nonstatutory presumption in favor of a partial withdrawal because he found no evidence that "any particular lane assignment" that went to a nonunion Nestle employee driver after the closures would have gone to a covered union driver before. Instead he reasoned that since the method of assigning work was the same before and after, and since covered union drivers got some of those lanes before, they would have continued to get some of those lanes afterwards. As explained above, ex ante identification of particular lanes that covered union drivers would have been assigned is neither possible nor necessary.

Nestle then argues that even if it is legally permissible to use this form of inference, the conclusion that follows is not that work was transferred but that it merely continued elsewhere. This is supposedly because a nonunion employee driver could perfectly well have driven any given route before the closures as well as after. This argument not only depends on the fallacy that work cannot be transferred unless it is identified, it also essentially

abolishes partial withdrawal liability on transfer grounds. In fact, the arbitrator was correct to find that there had been a transfer because, as he said, first, there were lanes driven by covered union drivers before the closures and none afterwards, and second, the method of assigning them was one that would have assigned some of those jobs to covered union drivers, although it was not possible to say which ones in advance.

Finally, Nestle argues that § 1385(b)(2)(A)(i) requires "at a minimum" evidence that Nestle assigned nonunion Nestle employee drivers *more* lanes after the closures than they were assigned before to support a finding of transfer. However, this requirement is not found in the text of the statute. The PBGC has indicated that there is "no quantitative test with regard to the statutory requirement of a transfer," Op. Letter 83-20 (Sept. 2, 1983, Def. Ex. 5; on the contrary, if "*any* of the work is shifted to a location where contributions are not required to the plan, then a partial cessation of the employer's obligations will occur." *Id.* (emphasis added). Nestle attempts to distinguish this opinion letter by suggesting that it "assumes the work performed at the closed facilities was shifted to other facilities and assumes no difficulty in identifying the work previously performed at the closed location." The first claim is wrong: the PBGC is setting criteria for what counts as a transfer. The second claim is

irrelevant. However the work is identified, the shifting of any quantity of it is enough to trigger partial withdrawal liability.

Here the Fund contends that historical patterns show that over seven quarters from 1994-95, covered union drivers averaged 8.75% of the Oconomowoc-DeKalb lane, and the arbitrator found similar results on the other lanes. It is reasonable to infer that there would have been about as much work assigned to covered union drivers in the period afterwards had the CBAs not been terminated. That work was taken up in part by noncovered nonunion Nestle employees. There was a transfer.

That being the case, the arbitrator was correct to find partial withdrawal liability. Because Nestle does not contest the amount, the award is AFFIRMED.

ENTER ORDER:

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 22, 2002